IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LEOPOLDO AGUADO GUEL                                                PLAINTIFF

                     v.                     Civil No. 06-5091

DEPUTY LARKIN; and
DEPUTY R. BRYSON                                         DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds pro se and in forma pauperis.

The events at issue in this lawsuit occurred while the plaintiff was detained at the Benton County Detention Center. Plaintiff maintains his constitutional rights were violated on March 28, 2006, when he alleges Deputies Larkin and Bryson used excessive force against him.

Defendants filed a summary judgment motion (Doc. 12). To assist plaintiff in responding to the summary judgment motion, a questionnaire was propounded (Doc. 18).

Plaintiff filed a timely response to the questionnaire was filed (Doc. 21). The summary judgment motion is before the undersigned for issuance of this report and recommendation.

### Background

Plaintiff, Leopoldo Aguado Guel, was booked into the Benton County Detention Center (BCDC) on February 8, 2006, on a hold for the United States Immigration and Customs Enforcement (ICE). *Plaintiff's Response* (Doc. 21)(*hereinafter Resp.*) at ¶ 1. He had re-entered the United States after having been previously deported. *Id.* at ¶ 2. He remained incarcerated at the BCDC until July 20th. *Id.* at ¶ 3.

-1-

The pending criminal charge was the sole reason Aguado-Guel was detained. *Resp.* at ¶ 4. Aguado-Guel completed and signed a medical questionnaire at the time of intake and listed no health problems. *Id.* at ¶ 5.

On March 1st, Aguado-Guel requested the phone numbers for his lawyer and was instructed to ask a pod deputy for the information. *Defendants' Ex.* 1 at page 1. On March 28th, at approximately 11:00, Aguado-Guel complained to Deputy Larkin that there were gnats in his rice. *Resp.* at ¶ 6.

According to an incident report prepared by Larkin, he inspected Aguado-Guel's tray and did not observe anything wrong with his rice. *Defts' Ex.* 4 at page 1. Larkin's report continues:

> I went over to the cart and saw that there was an extra tray, so I took the meat off because Inmate Aguado-Guel had already eaten the meat off of the other tray. He went back in to D-150. Approximately five minutes later he came back to the door and pushed the emergency button. I asked him what he needed. He told me he did not receive any meat. I told him I gave him the same amount of food that he gave to me. Inmate Aguado-Guel walked back to his table, dropped his tray, and kicked it against the door to Pod control. Corporal Bryson and I entered D-150. Inmate Aguado-Guel laid down on his stomach as we entered the pod. Corporal Bryson ordered him to stand up and place his hands behind his back. Inmate Aguado-Guel stood up, but did not place his hands behind his back. Corporal Bryson reached for Inmate Aguada-Guel's left wrist. Inmate Aguado-Guel pulled his arm away, balled up his fist, and took an aggressive stance. I took him by his left arm and I struck him with my knee in his left common peroneal. Corporal Bryson and I escorted Inmate Aguardo-Guel out of D-150. Inmate Aguado-Guel began to resist, and he was placed on the floor. Deputy Undiano handcuffed Inmate Aguado-Guel. Corporal Bryson and I assisted Inmate Aguado-Guel to his feet and escorted him to E-103 to be placed in disciplinary lockdown. As we entered the E-Pod hallway Inmate Aguado-Guel began to resist, and he was placed against the wall. I ordered Inmate Aguado-Guel not to resist. We escorted Inmate Aguado-Guel to cell 134 in E-103. I returned to my duties in D-Pod with no further incident.

*Defts' Ex.* 4 at page 1.

Aguado-Guel's version of these events differs. He indicates he was not asking to have his whole tray exchanged just the rice and celery. *Resp.* at ¶ 9. He indicates he did have ham and

cheese on his sandwich. *Id.* Five minutes after Larkin gave him a different tray, Aguado-Guel agrees he did push the emergency button in D-150. *Id.* at ¶ 10.

However, Aguado-Guel's indicates he never received a response. *Resp.* at ¶ 11. Because he did not receive a response he was waving his hand trying to get their attention. *Id.* At this point, Aguado-Guel states he was instructed to go away–by them waving back in a rude manner. *Id.* Aguado-Guel states he dropped his tray by the exit door and then walked discouraged and hungry walked back to his table. *Id.* at ¶ 12.

Aguado-Guel states he laid down on his stomach when Bryson and Larkin entered D-150. *Resp.* at ¶ 14. When he was told to, Aguado-Guel states he stood up and placed his hands behind his back. *Id.* at ¶ 15. However, he states Bryson roughed him up by twisting his arm high and pushed his body toward the door of the pod. *Id.* Larkin took his left arm and struck him in the knee in the left common peroneal. *Id.* at ¶ 18. Aguado-Guel asserts he was offering no resistance of any kind even though he was being mistreated. *Id.* at ¶ 17 & ¶ 19.

He agrees he was handcuffed and helped to his feet by Bryson and Larkin. *Resp.* at ¶ 20 & ¶ 21. He also agrees he was being escorted to E-103 to be placed on disciplinary lockdown. *Id.* at ¶ 21. However, he does not agree that he resisted in anyway. *Id.* at ¶ 22. He states his arms were locked by their arms in a position where he could not do anything and his feet were dangling in the air. *Id.*

By the time he was placed against the wall, Aguado-Guel states his body was limp or numb. *Resp.* at ¶ 23. Aguado-Guel states he still offered no resistance. *Id.* However, Aguado-Guel maintains Larkin was shouting about Aguado-Guel resisting to cover-up their torture of him.

*Id.*   Aguado-Guel was asked to explain how Larkin used excessive physical force against him, Aguado-Guel replied:

> By grabbing my left arm and twisting it, and at the same time punch or elbow my back, and then kicking my left common peroneal–which he has so far admitted in Exhibit 4-1.  While handcuff–he still continued the excessive physical force by, –slamming my body down the hall and causing my head to bump from the walls, side to side. . . .  Deputy Larkin was instructed by Corporal Pru[i]tt to quit but Deputy Larkin repeated the excessive physical force righ[t] outside the pod E-103 by slamming my face against the glass, once inside cell 134 Deputy Larkin yanked the handcuffs in violent way causing my two wrist[s] to bleed.  He then threat[e]ning me that if I move before they exit–that I was gonna get beat.

*Resp.* at ¶ 55.

Aguado-Guel was asked to explain how Bryson used excessive physical force against him, Aguado-Guel replied:

> As soon as I got of[f] the floor as was instructed by Deputy Bryson–he b[u]m[] rushed me towards the door to exit, but first twisted my left arm and then switched to my right–pressing the left side of my face against the glass.  Once outside Deputy Bryson twisted my right wrist nearly breaking it and stuck his thumb on the back of my right ear, causing pain.  Once handcuff[ed] my body was slam[m]ed on down the hall.  He was instructed by Corporal Pru[i]tt to stop but re[pea]ted the act once outside the pod E-103, and once inside the cell 134 he twisted my legs and press causing pain.  He then placed his knee on my spinal cord like at the be[gin]ing of the assulat outside D-150 causing severe pain to my back.

*Resp.* at ¶ 55.

Aguado-Guel indicates he intended to sue the defendants in both their official and individual capacities.  *Resp.* at ¶ 56.  Aguado-Guel also filed a motion to amend or correct his complaint to reflect that he intended to sue the defendants in both their individual and official capacities (Doc. 20).

Aguado-Guel maintains he received injuries to his back and was sore for a "a month–more or less, from the beating."  *Resp.* at ¶ 53.  He indicates he had cuts on his wrists from the handcuffs

and his right wrist was sore from where Bryson bent it backwards nearly breaking it. *Id.* He maintains the right wrist took two to three months to heal up. *Id.*

Aguado-Guel also contends he had bumps on his head from being slammed from side to side down the hall as he was being taken to lock-down. *Resp.* at ¶ 53. He indicates the bumps took two to three weeks to heal up.

Aguado-Guel states he was not offered any medical treatment. *Resp.* at ¶ 53. As soon as he could, Aguado-Guel indicates he reported the incident and his injuries to his attorney James Pierce. *Id.* Aguado-Guel did not submit a request for medical care as a result of any injuries he received on March 28th. *Id.* at ¶ 54.

Aguado-Guel was charged with refusing to obey the order of a deputy, failing to place his hands behind his back, and trying to assault jail staff. *Resp.* at ¶ 25. He received a disciplinary hearing on March 28th. *Defts' Ex.* 5 at page 1. In Aguado-Guel's defense, he stated that he was not a violent person and were only asking for a new tray. *Resp.* at ¶ 27. Aguado-Guel indicates he also requested a grievance but was told the deputy had no grievance forms at the moment. *Id.* Aguado-Guel then told the disciplinary deputy what Larkin and Bryson had done to him but the deputy took their side and said that would teach Aguado-Guel not to drop his tray again. *Id.*

Aguado-Guel was found guilty of a disciplinary violation and given thirty days lockdown and loss of privileges. *Resp.* at ¶ 28. He appealed the decision and the decision was upheld. *Id.* at ¶ 29.

Aguado-Guel did not submit a grievance about Larkin or Bryson using physical force against him on March 28th. However, Aguado-Guel maintains he asked Corporal Pruitt for a grievance form in front of the disciplinary hearing officer and was "told there were 'none' at the

moment" but he could get one later. *Resp.* at ¶ 52. Aguado-Guel states he never did get a grievance form. Aguado-Guel states he gave up "and knew what they were up to." *Id.* Aguado-Guel also indicates he was being refused the right to use the phone until one deputy allowed him to use it. *Id.*

On March 29th, Aguado-Guel requested an address for the United States District Court Clerk and one was provided. *Resp.* at ¶ 30. On March 30th, Aguado-Guel requested medical treatment. *Id.* at ¶ 31. He stated he was growing some sort of knots on both sides of his neck that looked like boils. *Id.* On April 3rd, Nurse McDonald attempted to examine him but he refused to see her. *Id.*

On April 21st, Aguado-Guel submitted a request. *Resp.* at ¶ 33. He stated his lock-down was almost up and he requested protective custody for the remainder of his stay in this country because of enemies he had made in D block or pod. *Id.* Aguado-Guel was informed that when he was released from lock-down he would be placed in protective custody. *Id.* at ¶ 34. However, Aguado-Guel was not placed on protective custody.

On May 23rd, Aguado-Guel requested medical treatment for a fever, sore throat, and stuffy nose. *Resp.* at ¶ 35. He was examined by Nurse McDonald on May 25th and given Ibuprofen and Benadryl. *Id.* at ¶ 36. He received the prescribed medication. *Id.* at ¶ 37.     On June 17, 2006, Deputy Lee reported that Aguado-Guel and several other inmates refused to obey a command to line up by their cell doors. *Resp.* at ¶ 38. Aguado-Guel asserts that he was lined up by his door with his mouth shut when some other inmates were cursing and singing loudly. *Id.* Aguado-Guel indicates this behavior angered Lee and he locked every body down. *Id.*     Lee

AO72A
(Rev. 8/82)

and Larkin collected the mats and shook the pod down. *Resp.* at ¶ 40. Aguado-Guel received a disciplinary hearing and was given ten days lock-down and loss of privileges. *Id.* at ¶ 41.

Sgt. Faulkenbury reported on July 8th while passing Aguado-Guel's cell he heard someone say: "There he is, by the door." *Defts' Ex.* 4 at page 6. According to Faulkenberry, Aguado-Guel then reached out, grabbed the door handle, and violently shook the door to D-150. *Id.* Aguado-Guel asserts he only pressed the handle enough to make a sound and that is when he was taken out of the pod and the sergeant jumped all over him–methaphorically speaking. *Resp.* at ¶ 42, ¶ 43 & ¶ 44. Aguado-Guel maintains he was being written up for "no true reasons." *Id.* at ¶ 44.

Aguado-Guel was locked down and escorted to his cell to gather his belongings by Deputy Grant. *Resp.* at ¶ 45. He received a disciplinary hearing on July 8th, for refusing the order of a deputy, making excessive noise, banging on cell doors, and crossing the red line without permission. *Id.* at ¶ 46(A). He was found guilty and given ten days lockdown and loss of privileges. *Id.*

At the hearing, Aguado-Guel stated he saw Faulkenbury through the window and pushed on the door to get his attention. *Resp.* at ¶ 46(B). Aguado-Guel indicates he was attempting to get Faulkenbury's attention because he needed another sock. *Id.* Aguado-Guel states he had only received one sock the rules are if you don't have socks you get locked down as well. *Id.* at ¶ 46(B) & ¶ 46(C). Thus, he states he stood no chance. *Id.* at ¶ 46(B).

On July 10th, Aguado-Guel submitted a grievance complaining that he had been put on lock-down for trying to solve a problem. *Id.* at ¶ 47. He indicated he needed a sock and had pressed the button in his cell and down at the public restroom and explained that he needed a sock only to be told who cares. *Id.*

Aguado-Guel stated he then pressed at the door trying to get the attention of the passing sergeant and ended up getting put on lock-down. *Resp.* at ¶ 48. In response to his grievance, Aguado-Guel was told he could appeal his lock-down. *Id.* at ¶ 49.

On July 12, 2006, Aguado-Guel submitted a request to be moved. *Resp.* at ¶ 50. He stated the person he was housed with liked to start problems and liked to be alone. *Id.* Jail personnel responded that he should follow the rules and learn to get along. *Id.*

However, Aguado-Guel indicates the person he was housed with was on protective custody and he was on lock-down custody and they should not have been housed together. *Resp.* at ¶ 50. Additionally, Aguado-Guel states he was informed the other inmate was in jail for child molestation. *Id.*

On July 19, 2006, Aguado-Guel requested the address of the County Clerk's Office because he wanted to file a divorce. *Resp.* at ¶ 51. He was given the address. *Id.* On July 20th, Aguado-Guel indicates he was sent to Washington County. *Resp.* at ¶ 44.

In support of his summary judgment response, the plaintiff has submitted to the court thirty-nine photographs taken by Rafael Marquez, an Interpreter for the United States Public Defender's Office (Doc. 22). Plaintiff has also attached to his summary judgment response, the following: a two page letter from Mario O'Valle, Sr., an inmate at the BCDC at the time of the incident who indicates he witnessed the incident with Aguado-Guel and describes what he saw that day; a number of notes from various inmates addressed to the Honorable Judge Issac C Parker that state: "I witnessed the incident talked about in complaint 150 and support the complaint;" a copy of a memorandum from Danny Copeland, United States Marshal Service, to Mark Spellman,

United States Marshal Service; and a copy of a memorandum from Interpreter Rafael Marquez to Assistant Federal Public Defender James Pierce.

According to the memorandum from Marquez to Pierce, the photographs were taken on March 30th, two days after the incident at issue in this case. The photographs show a laceration to Aguado-Guel's wrist above his armband, multiple abrasions and contusions on his arms, forehead, knees, thighs, back and behind his ears.

## Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

**Discussion**

Defendants have now moved for summary judgment. First, defendants argue they are sued in their official capacities only. As there is no evidence of any custom or policy of Benton County that was a moving force behind any alleged violation of plaintiff's constitutional rights, they contend there is no basis on which they can be held liable under § 1983. Second, defendants contend they are entitled to summary judgment because the plaintiff has admitted he did not exhaust his administrative remedies. Third, defendants contend they are entitled to summary judgment because only a minimal level of force was used against the plaintiff and he suffered no physical injury as a result of the use of force. Finally, if the complaint is construed to be asserting an individual capacity claim, they contend they are entitled to qualified immunity. We will address each argument in turn.

*Official Capacity v. Individual Capacity Claims*

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendants acted under color of state law and that they violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. In *Gorman v. Bartch*, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct. at 362.

*Gorman*, 152 F.3d at 914.

The Eighth Circuit has advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. *Nix v. Norman*, 879 F.2d 429, 431 (8th Cir. 1989). *See also Andrus v. Arkansas*, 197 F.3d 953 (8th Cir. 1999)(In actions against officers specific pleading of individual capacity is required to put public officials on notice they will be exposed to personal liability). When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."); *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 620 (8th Cir. 1995)("*Nix*

-11-

requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient.").

At the same time, we are charged with liberally construing pro se complaints. *See e.g. Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)(requirement that pro se complaints be construed even more liberally than counseled pleadings); *White v. Wyrick*, 530 F.2d 818, 819 (8th Cir. 1976)(finding pro se petition should be "interpreted liberally and . . . should be construed to encompass any allegation stating federal relief"). In responding to the summary judgment motion, Aguado-Guel has noted that he intended to sue the defendants in both their individual and official capacities. *Resp.* at ¶ 56. He also filed a motion to amend his complaint to specify that he was suing the defendants in both their individual and official capacities. (Doc. 20). By separate order, the motion to amend the complaint will be granted. *See e.g., Murphy v. Arkansas*, 127 F.3d 750, 755 (8th Cir. 1997)(complaint against state officials who were sued in their official capacities was deemed amended to assert personal capacity claims, where plaintiff moved to amend complaint in response to motion for summary judgment).

### *Failure to Exhaust Administrative Remedies*

Defendants contend Aguado-Guel failed to exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a). They argue Aguado-Guel failed to submit a grievance regarding the March 28th incident. They contend this failure is fatal to his claim.

Aguado-Guel admits he did not file a grievance. *Resp.* at ¶ 52. However, he indicates he asked for a grievance form right after the incident and was told he would be brought one later. *Id*. He also explained what the deputies had done to him. *Id*. at ¶ 52 & ¶ 27.

AO72A
(Rev. 8/82)

As amended by the PLRA, 42 U.S.C. § 1997e(a) mandates exhaustion of available administrative remedies before an inmate files suit. Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

The Supreme Court in *Booth v. Churner*, 532 U.S. 731, 738-39, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001) held that "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought." *Walker v. Maschner*, 270 F.3d 573, 577 (8th Cir. 2001). Further, the term "administrative remedies" has been held to encompass remedies not promulgated by an administrative agency. *Concepcion v. Morton*, 306 F.3d 1347, 1352 (3d Cir. 2002). Specifically, it has been held that a grievance procedure contained in a handbook constitutes an available administrative remedy within the meaning of § 1997e(a). *Conception*, 306 F.3d at 1352. When all claims have not been exhausted, the case is subject to dismissal. *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002); *Graves v. Norris*, 218 F.3d 884, 885 (8th Cir. 2000).

In this case, Aguado-Guel has asserted under penalty of perjury that he requested a grievance form in order to submit it regarding the March 28th incident and was told no forms were available. Aguado-Guel indicates he then orally reported to the deputies what had happened to him. We therefore decline to dismiss this lawsuit on the grounds that Aguado-Guel did not properly exhaust his administrative remedies.

***Excessive Force***

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

In this case, Aguado-Guel was a pretrial detainee. In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *Schoemehl*, 878 F.2d at 1048. The relevant

inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, plaintiff and the defendants give contradictory versions of what occurred during the alleged use of force. While some use of force may be necessary when a detainee is refusing to obey orders or is being disruptive, to find the use of force was necessary and reasonable it would necessary at this stage for the court to believe the defendants' version of the events of March 28th and disbelieve plaintiff's version of the events. This the court is not free to do on a summary judgment motion.

Moreover, the court cannot say that there is no proof on physical injury to the plaintiff. Plaintiff has alleged that he suffered injuries to his head, back, wrists, and arms that took weeks to heal. *Andrews v. Fuoss*, 417 F.3d 813, 818 (8th Cir. 2005)("Although we have remarked that it remains an open question in this circuit whether an excessive force claim requires some minimum level of injury, we have also held that a de minimis use of force or injury is insufficient to support a finding of a constitutional violation. . . . In this case, Andrews alleges at most very minor injuries, likely nothing more than the temporary and slight aggravation of pre-existing conditions [pain flare-up relating to pre-existing neck and back conditions that left Andrews with a sore neck and horrible headache]. These are precisely the type of de minimis injuries that preclude a claim for excessive force.")(citations and internal quotation marks omitted).

### *Qualified Immunity*

"Qualified immunity is a defense available to government officials who can prove that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Carroll v. Pfeffer*, 262 F.3d 847, 849 (8th Cir. 2001)(*quoting Harlow*

-15-

*v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991)(*quoting, Malley v. Briggs*, 475 U.S. 335, 343, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). The inquiry is normally one of pure law. *J.H.H. v. O'Hara*, 878 F.2d 240 (8th Cir. 1989).

"The determination of whether a state actor is entitled to the protection of qualified immunity is a two-step process." *Washington v. Normandy Fire Protection Dist.*, 272 F.3d 522, 526 (8th Cir. 2001). First, the court must ask whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendants'] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Second, the court must determine if the right was clearly established. *Washington*, 272 F.3d at 256.

"[T]here is no question that [the] right to be free from excessive force" is clearly established. *Wilson*, 209 F.3d at 716. *See also McGruder v. Heagwood*, 197 F.3d 918 (8th Cir. 1999). Viewed in the light most favorable to Aguado-Guel, the evidence does not show an objective need for the force that was used because Aguado-Guel was not jeopardizing any person's safety and was not threatening the security of the facility. *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002). "The law recognizes that order and discipline are important in running a correctional institution, but that does not authorize the arbitrary use of force, nor does it justify punitive use of force on difficult inmates not posing a real threat to other persons or raising security concerns." *Id.* (citations omitted). *See Graham v. Conner*, 490 U.S. 386, 395 n. 10, 109 S. Ct.

1865, 104 L. Ed. 2d 443 (1989)(pre-trial detainee's claim properly analyzed under the due process clause of the Fourteenth Amendment). Defendants "arguments asserting qualified immunity rest largely on ignoring disputed facts in the record and asking this court to resolve factual disputes in [their] favor." *Wilson v. Lawrence County*, 260 F.3d 946, 951 (8th Cir. 2001). On the record before the court, we find defendants not entitled to qualified immunity.

### Conclusion

For the reasons stated, I recommend that the defendants' motion for summary judgment (Doc. 12) be denied.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 30th day of July 2007.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE