IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LEOPOLDO AGUADO GUEL                                                      PLAINTIFF

v.                              Civil No. 06-5091

DEPUTY LARKIN; and
DEPUTY R. BRYSON                                                          DEFENDANTS

**MEMORANDUM OPINION**

This is a civil rights action brought by Leopoldo Aguado-Guel under the provisions of 42 U.S.C. § 1983. Aguado-Guel filed this action *pro se* and *in forma pauperis*. Aguado-Guel contends excessive force was used against him by the defendants on March 28, 2006, while he was incarcerated at the Benton County Detention Center.

The evidentiary hearing was held on April 22, 2008. Following the presentation of evidence, the issues were taken under advisement pending preparation of this memorandum opinion.

**I. BACKGROUND & EVIDENCE PRESENTED**

At the evidentiary hearing, the court heard testimony from the following witnesses: (1) James Pierce; (2) Rafael Marquez; (3) Leopoldo Aguado-Guel; (4) Dana Larkin; (5) Randy Bryson; and (6) Hunter Petray. For purposes of discussion, we will summarize in the first person the hearing testimony of the various witnesses. The summary of the testimony will not necessarily be presented in the order the witnesses testified at the hearing.

### *Asst. Federal Public Defender James Pierce*

On March 20th or March 30th, 2006, Aguado-Guel made a phone call to the office saying he had been mistreated in the pod. I don't believe I had received notice of this from any other inmates.

I asked our investigator, Rafael, to go to the jail. Rafael proceeded to the jail to document and photograph Aguado-Guel's injuries. A week or so later I went to the jail to view the injuries myself. The injuries were consistent with those depicted on the photographs. *Plaintiff's Exhibit* 1. The red marks were starting to turn pink and fade but the photographs are fairly representative of the injuries. The injuries were consistent with Aguado-Guel's account of what had occurred.

### *Rafael Marquez*

I went to the Benton County Jail. I took the pictures of Aguado-Guel's injuries. I believe it was on March 30th. I felt two bumps on his head–one on the right side of the head and one on the back of the head. I asked detention center personnel to shave his head but they refused.

I took the thirty-nine pictures that make up *Plaintiff's Exhibit* 1. What the photographs show are the injuries I saw on Aguado-Guel that day. I took the photographs based on what he said happened. He would show me an area of his body and I would photograph it.

I also took a statement from Aguado-Guel that day. I reduced his statement to writing. *Plaintiff's Exhibit* 2.

I believe Aguado-Guel said the abuse happened two days earlier on the 28th. I didn't see any bruising on him. Everything was red–nothing was starting to turn. There was no bruising. He had some little bumps I felt like it was regular acne on his back. *See e.g., Plaintiff's Exhibit* 1 at page 35. The red lines on his back I believe were part of the injury. *Id.*

### *Leopoldo Aguado-Guel*

I was at the Benton County Detention Center (BCDC) from February 8, 2006, until July of 2006 when I was transferred to the Washington County Detention Center. On March 28, 2006, my tray had gnats on the rice and celery. I brought this to the attention of Larkin. He gave me a new tray but he took my ham and cheese sandwich. I pushed the button. I didn't get an answer.

I was upset because the other tray didn't have meat on it and Larkin hadn't checked my tray properly or he wouldn't have given me a tray without ham and cheese. He did give me a different tray. The rice and celery was fine. But the sandwich had only bread. I was upset about it.

I was motioning with both pieces of bread. Larkin and Bryson were the only guards in the picket or control room. There is a two-sided mirror between the pod and the control room. You can barely see into the control room. Basically, you can only see shadows.

There is a redline a foot or so in front of the mirror or window to the control room. I didn't know it was against the rules to cross the red line. I was in front of the glass. I was within a short distance of the glass but not across the red-line. Then they were waving me back. I dropped my tray. I deliberately threw the tray on the floor.

I don't know why Marquez put in his report that I slid the tray towards the pod door causing food to splash against it. I didn't slide it across the floor. He must have misunderstood.

Sandoval and Espinoza, other inmates in the pod, told me to get on the floor. I got on the floor face down and spread eagle. I knew the guards would be coming to get me. Larkin and Bryson came in. Bryson told me to get up. Bryson grabbed my arm and "bum rushed" me to the

door. Larkin kicked me in the peroneal. The inmates were saying "boo, boo." Larkin was screaming in my ear using profanity. He was saying he was tired of you "mother f------ thinking you are running the place." Bryson placed his thumb on the back of my ear causing severe pain. After that, they said they were ready. I think Undiano handcuffed me. I know it was a third person there. I'm not sure who actually did handcuff me.

They lifted me up. They had their arms locked through mine. I could not do anything. My feet were dangling. They were bumping me from side to side in the hallway. It caused bumps on my head. They slammed my face against the window in holding. They told me not to move. They opened the door. They slammed me into the cell.

Larkin then started yanking the handcuffs off me very roughly making threats. He said if I moved they were going to beat the living f— out of me. After that, Mr. Pruitt came back and asked me what happened. I asked for a grievance. He said he would get me one later. I never got one.

I told Pruitt I needed a nurse so she could check my body. I was denied that.

A few minutes later, Larkin brought my belongings in. He slammed them on the bunk and gave me a dirty look.

I went to a disciplinary hearing. *See Defendants' Exhibit* 4. I brought my complaints about Larkin and Bryson up to Carter. He said that will teach you to drop your tray. I asked for a grievance. They said they didn't have one. They said they would get me one later. I was refused a phone until March 30th. This was the only time I was written up by Bryson or Larkin.

I submitted a request for the court clerk's address on March 29th. *Defendants' Exhibit* 5. I got this form from my cell-mate. *Id.* I also got the form on which I submitted a medical

request on March 30th from my cell-mate. *Defendants' Exhibit* 6. I submitted this request because of knots on my neck. The knots on my neck looked like boils. These were different knots than the ones I got on the 28th. They offered me medical attention but the boils had already gone down. On April 3rd, I was offered a visit to the nurse for the boils and didn't go. *Defendants' Exhibit* 7. I didn't see the need for medical attention for my injuries from the 28th. My back was sore but I didn't ask for medical attention for it.

I never did submit a grievance about Larkin and Bryson. I had been denied a grievance. I didn't think they would honor a grievance anyway. They were already denying me a form. I got the forms submitted as *Defendants' Exhibit* 8 from the guards.

I phoned Pierce's office. Marquez came and took pictures. I didn't mention Larkin or Bryson's name to Marquez.

Later I requested protective custody. *See Defendants' Exhibit* 8 at page 2. I was denied that as well. I went back to the tank. I started getting write ups. Some of the incidents I was written up for, I had nothing to do with.

I saw Pierce a week later and it was starting to turn. There was bruising. I don't recall if the bumps on the head had gone done.

### *Dana Larkin*

I work for the Benton County Sheriff's Department. I'm a jailer. I had the same position on March 28, 2006.

Aguado-Guel came to the door and said there were gnats in his rice. I didn't see any gnats. But I went ahead and got him a new tray. I gave him the items he had given me. There

was no ham and cheese sandwich on his tray–just rice and celery and dessert. I got a new tray. He took it and went back into the cell block.

He looked at the tray. He dropped it and kicked it across the cell block towards the window. Bryson and I went into the pod. I made the decision to go in the pod.

Aguado-Guel threw the tray. He broke the rules by acting in a boisterous manner. He could incite the other inmates. There were thirty-two others.

When we entered the pod, Aguado-Guel was laying on the floor. We told him to get up and place his hands behind his back. He got up when told to do so but didn't place his hands behind his back. Bryson went to grab for his left wrist to put it behind Aguado-Guel's back. Aguado-Guel pulled away and made a fist with his right hand. He took an aggressive stance. I believed a blow was imminent.

I took his left arm. I struck him with my knee in his common peroneal. My strike was on the side of his leg about six inches above his knee. I learned to perform this strike through the jail standards training course. It is a forty hour course.

Bryson gained control of Aguado-Guel's other wrist and we escorted him out of the pod. Aguado-Guel was resisting. He was kicking out. We went into the pod control area outside the pod. This is where the deputies sit and watch the inmates.

It is not possible for the inmates to see into the pod control unless the inmate puts his face against the glass. The glass between the pod and the control area is one way glass. The outside of the glass looks like mirror.

Aguado-Guel continued to fight and act in an aggressive manner so we placed him on the floor and another deputy handcuffed him. I believe it was Deputy Undiano.

Aguado-Guel was helped to his feet and we started escorting him down E hallway. He started kicking us. We put him against the wall and told him to quit kicking us. The hall is eight feet wide.

We escorted him to the lock-down pod and to the cell he had been assigned to. He was laid down on his stomach and one cuff was removed. He was told to put his hand on the floor and the other cuff was removed. He was then instructed to prone out and not to move or advance until we were out the door.

I did a report following the incident. *Defendants' Exhibit* 1. The red line on the floor is painted so the inmates do not put their face on the window and look into pod control. I'm not 100% sure if he crossed the red line. However, if he looked into the window and saw us, he had to have crossed the line. I never had any other dealings with Aguado-Guel other than this day.

### *Randy Bryson*

I work for the Benton County Sheriff's Department. I'm a corporal in the jail. I was in the same position on March 28, 2006. There are no cameras in the pod.

I overheard Aguado-Guel say he had some bugs in his tray. Larkin gave him a new tray. I released the buzzer to open the pod door. Aguado-Guel went back into the pod and kicked his tray.

Larkin and I went into the pod. When we entered, Aguado-Guel was on the floor. He knew we were coming to get him. He was told to get up. He got up when told to do so but he was also told to put his hands behind his back. He didn't comply. I went to gain control of his left arm. He pulled away. He balled up his fist.

AO72A
(Rev. 8/82)

I reached back and grabbed both his arms and held them behind his back. Larkin took control of his left arm. I was trying to get control of his right arm. We took him outside the pod. We told him to quit resisting. Aguado-Guel was handcuffed by either Larkin or Undiano.

As we were taking Aguado-Guel down E hallway, he was resisting. You have to turn sideways to get through the sliders. We were not holding Aguado-Guel the way he said. We put him against the wall. We told him to quit resisting. We took him to a cell. He was prone on the floor and the cuffs were removed one at a time. I typed up a report after the incident. *Defendants' Exhibit* 2.

### *Captain Hunter Petray*

I work at the Benton County Sheriff's Office. I'm the jail administrator. I occupied the same position in March of 2006. I'm the custodian of records.

Defendants' exhibit 4 is the inmate disciplinary action form on Aguado-Guel. Sgt. Culotta was the hearing deputy. I had no part in the hearing. If an inmate requests a grievance form at the hearing, the jail policy would have been to provide one.

We use a request form on which the inmate can circle the word "request," "grievance," or "medical" depending on the nature of his complaint. Inmates obtain the forms from the guards. An inmate usually asks for whatever type of form the inmate intends to circle. For example, if the inmate intends to circle medical on the form, he asks for a medical request form.

Requests usually go to the shift sergeants. Grievances come to me. Medical requests go to the nurse or the doctor. Aguado-Guel submitted no grievances to me, verbal or written, regarding Larkin or Bryson. To my knowledge Aguado-Guel was not denied any forms.

Defendants' exhibits 5, 6, and 8, are all forms submitted by Aguado-Guel.

Defendants' exhibit 7 is the medical record for Aguado-Guel. This is his entire medical record. Defendants' exhibit 9 is the policy and procedure regarding the use of force and restraint. The policy calls for the use of only the amount of force necessary to control and take care of the situation.

## II. DISCUSSION

At the conclusion of the presentation of Aguado-Guel's evidence and again at the conclusion of the evidentiary hearing, defendants' moved for judgment as a matter of law on the grounds that Aguado-Guel failed to exhaust his administrative remedies. Defendants also maintain that they are entitled to judgment in their favor because Aguado-Guel suffered no physical injury from the alleged use of force. They point out Aguado-Guel conceded he needed no medical care.

### *Failure to Exhaust Administrative Remedies*

As amended by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a) mandates exhaustion of available administrative remedies before an inmate files suit. Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court in *Booth v. Churner*, 532 U.S. 731, 738-39, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001) held that "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought." *Walker v. Maschner*, 270 F.3d 573, 577 (8th Cir. 2001).

-9-

In this case, Aguado-Guel admits he did not submit a grievance about the March 28th incident. He asserts that he asked for Pruitt for grievance form and never received one. Aguado-Guel also asserts he asked for a grievance form at the disciplinary hearing and was told they didn't have a form and they would get him one later. Aguado-Guel states he never received the requested grievance forms.

However, it is clear Aguado-Guel had access to forms. He submitted a request form dated March 29th. *See Defendants' Exhibit* 5. This same form can be utilized to submit a grievance. He also submitted a medical request dated March 30th. *See Defendants' Exhibit* 6. Although Aguado-Guel states he received these forms from a cell-mate, it is clear he had the means of submitting grievances about the incident. In fact, he testified he did not submit a grievance because he did not believe they would honor it anyway. Inmates are only excused from complying with an institution's grievance procedures "when officials have prevented prisoners from utilizing the procedures, or when officials themselves have failed to comply with the grievance procedures." *Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005)(citations omitted).

Aguado-Guel's beliefs are insufficient to excuse his failure to exhaust his administrative remedies. *Chelette v. Harris*, 229 F.3d 684, 688 ("Section 1997e(a) says nothing about a prisoner's subjective beliefs, logical or otherwise, about administrative remedies that might be available to him."). There is no evidence in this case that any Benton County Detention Center official "thwarted an attempt [of Aguado-Guel] to initiate the procedures or that any official made it impossible for [him] to file grievances." *Id.* In fact, Aguado-Guel submitted forms, the same forms that may be utilized to submit requests, grievances, or medical requests, to detention center personnel on March 29th, 30th, and April 21st, among other dates. *See Defendants' Exhibits* 5, 6, and 8 at page 2.

-10-

We conclude Aguado-Guel failed to exhaust his administrative remedies. Alternatively, for the reasons discussed below, we find the defendants' entitled to judgment in their favor on the excessive force claim.

***Excessive Force***

In this case, Aguado-Guel was a pre-trial detainee. In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *See Schoemehl*, 878 F.2d at 1048. The

AO72A
(Rev. 8/82)

relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, Aguado-Guel testified he knew when he deliberately dropped his food tray that officers would be entering the pod to come for him. This was the reason he spread eagle on the floor of the pod. When he was ordered to stand up, Aguado-Guel and the defendants testified he complied with this order. The defendants testified Aguado-Guel stood up but failed to put his hands behind his back. Defendants additionally testified when Bryson attempted to gain control of Aguado-Guel's left arm, he pulled away, made a fist, and took an aggressive stance.

According to Aguado-Guel, defendants then used force to: "bum rush" him to the door; Larkin kicked him in the peroneal; Bryson placed his thumb behind his ear causing pain; after he was handcuffed to lift him up with his feet dangling and take him down the hallway; he was bumped from side to side in the hallway; he was slammed against the window in holding; and he was slammed into a cell.

Aguado-Guel received a disciplinary violation for refusing the order of a deputy, failure to place his hands behind his back, and trying to assault jail staff. *Defendants' Exhibit* 4. He was found guilty. *Id.* He was given thirty days lock-down and loss of privileges. *Id.* He appealed the decision and the decision was upheld. *Id.*

Given that Aguado-Guel was found guilty of these disciplinary violations, it is appropriate to consider his failure to obey the order of a deputy, his failure to place his hands behind his back, and his attempt to assault jail staff, in determining whether the degree of force

AO72A
(Rev. 8/82)

employed was excessive. We believe plaintiff has failed to establish by a preponderance of the evidence that excessive force was used against him by Larkin or Bryson on March 28, 2006.

Moreover, we note that many of the pictures submitted as plaintiff's exhibit 1 appear to depict scratches or a rash of some type rather than injuries sustained as a result of being slammed into the wall or floor. *See e.g., pages* 4-12, 15-35. Additionally, the marks may easily have been the result of Aguado-Guel's own actions. *See Brandt v. Davis*, 191 F.3d 887, 892 (8th Cir. 1999)(court considers whether individual is resisting and if his injuries can be explained by his own conduct).

In excessive force cases, in addition to examining the circumstances surrounding the use of force, the court considers the result of the force. *Crumley v. City of St. Paul, Minn.*, 324 F.3d 1003, 1007-1008 (8th Cir. 2003)(citations omitted)("Crumley contends she defensively moved away from the officer to keep him from getting hold of her once he pushed her. While Crumley's reaction may have been entirely natural, it nonetheless constituted resistance. Resistance may justify the use of greater force. Even more harmful to Crumley's position, she has not alleged she suffered any physical injury from the police officer's push or shove. The absence of an injury altogether suggests to use the force used here was reasonable."). In this case, Aguado-Guel refused an order to put his hands behind his back and was struggling with the officers. *See Defendants' Exhibit* 4. His actions resulted in the defendants employing greater force to remove him from the pod and take him to lock-down.

Finally, Aguado-Guel testified at the evidentiary hearing that he needed no medical treatment as a result of the injury. While at the BCDC, he submitted a request for medical

treatment for unrelated "knots" or boils on March 30th and did not mention any injury from the alleged use of excessive force by Larkin and Bryson. *Defendants' Exhibit* 6. On April 3rd, when medical treatment was offered to him, Aguado-Guel refused to see the nurse. *Defendants' Exhibit* 7. No evidence was submitted suggesting Aguado-Guel suffered any injury other than some temporary soreness and minor redness and abrasions that were due, at least in part, to Aguado-Guel's own actions. Clearly, Aguado-Guel had access to medical care on April 4th and refused it because he believed it was unnecessary.

### III. CONCLUSION

For the reasons stated, judgment will be entered in favor of the defendants and this action be dismissed. A separate judgment in accordance with this opinion will be entered.

DATED this 6th day of May 2008.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)